UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ANTHONY SOBERRI and
CAROLYN A. SOBERRI,

        Plaintiffs,

        v.                                                      Case No. 25-C-1065

GREAT LAKES LAW FIRM, LLC,

        Defendant.

## DECISION AND ORDER GRANTING MOTION TO DISMISS

Plaintiffs Anthony Soberri and Carolyn Soberri sued Defendant Great Lakes Law Firm, LLC, located in Madison, Wisconsin, for violations of the Credit Repair Organizations Act (CROA), 15 U.S.C. § 1679, *et seq.* and the Wisconsin Deceptive Trade Practices Act, Wis. Stat. § 100.18, *et seq.*, as well as fraud, negligent misrepresentation, breach of contract, breach of fiduciary duty, and legal malpractice. The court has jurisdiction over Plaintiffs' CROA claim under 28 U.S.C. § 1331 and supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367(a).

The case was originally filed in the Western District of Wisconsin but was transferred to this court and consolidated with *Soberri v. Consumer Legal Group, P.C.*, No. 24-C-804, on motion of the parties. Both cases are before the court on the defendants' motions to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Although Plaintiffs have asserted the same claims against each defendant based on similar allegations, the contracts on which Plaintiffs' claims are based are different and are governed by different State's laws. To avoid confusion, the court will therefore issue separate decisions in each case, even though the ultimate conclusion is

the same.  In this case, because the court concludes Great Lakes is not a Credit Repair Organization, Plaintiffs' federal claim will be dismissed.  With its federal claim gone, Plaintiffs' state law claims will be dismissed without prejudice pursuant to 28 U.S.C. § 1367(c).

## LEGAL STANDARD

A motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the complaint to state a claim upon which relief can be granted.  *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990); *see* Fed. R. Civ. P. 12(b)(6).  When deciding a motion to dismiss, the court accepts as true all well-pleaded facts in the complaint and draws reasonable inferences in favor of the plaintiff.  *Pierce v. Zoetis, Inc.*, 818 F.3d 274, 277 (7th Cir. 2016) (citation omitted).  Legal conclusions and conclusory allegations that merely recite the elements of the claim, however, are not entitled to this presumption of truth.  *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 680–81 (2009)).

In deciding a Rule 12(b)(6) motion, a court may also consider documents attached to the motion to dismiss if they are referred to in the plaintiff's complaint and are central to his claim.  *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012).  If documents attached to a complaint contradict the allegations of the complaint, the document controls.  *Northern Indiana Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 454–55 (7th Cir. 1998).  This rule "prevents a plaintiff from 'evad[ing] dismissal under Rule 12(b)(6) simply by failing to attach to his complaint a document that prove[s] his claim has no merit.'"  *Brownmark Films*, 682 F.3d at 690 (quoting *Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002)).

## ALLEGATIONS OF THE AMENDED COMPLAINT

In Plaintiffs' amended complaint against Great Lakes, Plaintiffs allege they experienced financial hardship in early 2021.  Am. Compl. ¶ 8, Case No. 25-C-1065, Dkt. No. 26.  "Due to

2

financial hardship, Plaintiffs were unable to keep up with their mounting debt." *Id.* ¶ 9. They then "began looking for debt relief companies that could assist them in resolving their debt and improving their credit." *Id.* ¶ 10. Plaintiffs found Great Lakes through their search and contacted Great Lakes to inquire about their services. *Id.* ¶ 11. Plaintiffs allege that during a call with Great Lakes' "agent," the agent represented to Plaintiffs that it would be able to: "(1) resolve Plaintiffs' financial obligations for a significant discount by negotiating with Plaintiffs' creditors; and (2) improve Plaintiffs' credit scores." *Id.* ¶ 12. Plaintiffs allege that Great Lakes further represented to them that all they would need to do is make monthly payments over a certain period of time and that Great Lakes would utilize the payments to expeditiously resolve their enrolled debts. *Id.* ¶ 13.

In or around October 2021, Plaintiffs formally enrolled approximately $27,250.75 into Great Lakes' debt settlement program by entering into a contract with Great Lakes "for legal and debt resolution services." *Id.* ¶¶ 14–15. Plaintiffs made the required monthly payments of $475.63 until March 2023, but they claim that Great Lakes failed to resolve Plaintiffs' debts as quickly as promised or improve Plaintiffs' credit scores. *Id.* ¶¶ 16–21, 29. Plaintiffs also allege that they relied on Great Lakes' false representation that an accumulation of 25% of the then-current balance of an enrolled debt would enable Great Lakes to effectively negotiate and work towards resolving their accounts. *Id.* ¶ 22. Plaintiffs allege that Great Lakes "strung Plaintiffs along" and falsely represented it had been working with creditors to settle debts, despite never resolving a single debt that was enrolled in the program. *Id.* ¶¶ 23–26. Plaintiffs paid no less than $10,000, but Great Lakes did not meaningfully negotiate with creditors, resolve Plaintiffs' debts, or improve Plaintiff's credit scores. *Id.* ¶¶ 27–28.

Plaintiffs canceled Great Lakes' services in March 2023. *Id.* ¶ 29. Plaintiffs began the contractually required arbitration process, but Great Lakes failed to pay its portion of the fees to

3

the American Arbitration Association—accordingly, the AAA declined to administer the case. *Id.* ¶¶ 33–36. This lawsuit followed.

## ANALYSIS

Plaintiffs' sole federal claim is for violations of the CROA. "Congress passed the [CROA] in 1996 in response to the growing trend whereby 'credit repair' companies used abusive and misleading practices to take advantage of debtors seeking to improve their credit records." *Greene v. CCDN, LLC*, 853 F. Supp. 2d 739, 749–50 (N.D. Ill. 2011). The statute's purposes are "(1) to ensure that prospective buyers of the services of credit repair organizations are provided with the information necessary to make an informed decision regarding the purchase of such services; and (2) to protect the public from unfair or deceptive advertising and business practices by credit repair organizations." 15 U.S.C. § 1679(b). Toward that goal, the CROA requires certain disclosures to consumers and prohibits, *inter alia*, false or misleading representations of the services they provide to consumers. 15 U.S.C. §§ 1679b(a)(3), 1679c. Great Lakes contends that Plaintiffs' claims under the CROA fail because Great Lakes is not a credit repair organization within the meaning of the CROA.

A "credit repair organization," as defined by the CROA, "means any person who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform (or represent that such person can or will sell, provide, or perform) any service, in return for the payment of money or other valuable consideration, for the express or implied purpose of--

(i) improving any consumer's credit record, credit history, or credit rating; or

(ii) providing advice or assistance to any consumer with regard to any activity or service described in clause (i)." 15 U.S.C. § 1679a(3). To state a claim under the CROA, Plaintiffs must plausibly allege that Great Lake is a "credit repair organization."

4

Plaintiffs alleged in their amended complaint that "[d]uring a call with Defendant's agent, the agent represented to Plaintiffs that it would be able to: (1) resolve Plaintiffs' financial obligations for a significant discount by negotiating with Plaintiffs' creditors; and (2) improve Plaintiffs' credit scores." Am. Compl. ¶ 12. This allegation, they contend, is enough to show that Great Lakes is a credit repair organization at the pleading stage. The allegation that Great Lakes' services were intended to repair Plaintiffs' credit scores, however, is belied by the very contract they signed with Great Lakes.

In support of their argument that it is not a credit repair organization, Great Lakes relies upon the Retainer Agreement Plaintiffs signed and a copy of which Plaintiffs attached to their amended complaint. Dkt. No. 26-1. The Retainer Agreement describes the services Great Lakes has agreed to provide as debt resolution services, which it offers under its Debt Resolution Program. *Id.* at 2. Those services are listed under headings that include "Debt Analysis," in which "Great Lakes will review Client's personal hardship and other debt circumstances and formulate a plan to negotiate improved terms"; "Negotiate and Resolve Client Debt," in which "Great Lakes will represent Client in the negotiation and resolution of the unsecured debts listed in the Creditor List enclosed in this Agreement"; and "Litigation Defense Services," in which "Great Lakes will advise and represent Client in their defense of litigation initiated by creditors or collectors to recover debts listed in the Agreement." *Id.* at 4. The Retainer Agreement states explicitly, however, under the heading "Services Outside Scope of Representation," that "Great Lakes does not engage in credit repair or credit reporting." *Id.*

Under a section with the heading "Further Important Terms and Disclosures," the Agreement states: "Your participation in the program will likely have an adverse effect on your credit worthiness and may result in you being sued by creditors or debt collectors." *Id.* at 15. And

5

in the "Face to Face Presentation" attached to the Retainer Agreement, Plaintiffs acknowledged that they had been shown a power point presentation informing them that "the program will likely adversely affect your creditworthiness." *Id.* at 36. More specifically, one of the slides they acknowledged viewing during the in-person presentation titled "IMPORTANT THINGS TO KNOW" included the following statement: "Great Lakes does not contact credit bureaus to clean up or repair your credit." *Id.* at 48.

Finally, the Retainer Agreement has a merger and non-reliance clause under the heading "Entire Agreement," which reads:

> This Agreement is the entire agreement between the parties. All prior negotiations and discussions are superseded by this Agreement. Great Lakes has made no representations other than those expressly set forth in this Agreement, and neither Party has relied upon any representations or promises other than those expressly set forth herein.

*Id.* at 17. Because the Agreement was not merely mentioned in Plaintiffs' amended complaint, but attached to it and central to their claim, Great Lakes argues that the court can and should consider it in deciding its motion to dismiss. And because the Agreement makes clear that Great Lakes is not a credit repair organization, Great Lakes contends its motion to dismiss Plaintiffs' claims under the CROA should be granted.

In the face of the clear and unequivocal language of the contract Plaintiffs signed and the Face-to-Face Presentation they acknowledge receiving, Plaintiffs' allegation that Great Lakes represented that its services were intended to improve their credit score cannot stand. Their Retainer Agreement with Great Lakes is central to their claim. That agreement set out in clear terms what services Great Lakes would provide, none of which were improvement of Plaintiffs' credit score. At the same time, the Agreement explicitly listed "credit repair or credit reporting" as services it did not provide. Plaintiffs' allegation that at some point an agent of Great Lakes

6

stated over the phone that the services Great Lakes provided would not only "resolve Plaintiffs' financial obligations for a significant discount by negotiating with Plaintiffs' creditors" but also "improve Plaintiffs' credit scores" does not transform Great Lakes into a credit repair organization.

Plaintiffs cite the Ninth Circuit's decision in *Stout v. FreeScore, LLC*, 743 F.3d 680 (9th Cir. 2014), for the proposition that "a defendant's self-serving disclaimer that it is not a credit repair organization does not cure the representations it made that it offers services that could improve a consumer's credit." Dkt. No. 48 at 3. In *Stout*, the defendant held itself out as a "provider of credit scores, reports and consumer credit information" but explicitly denied that it was a credit repair organization. 743 F.3d at 681, 683. In reversing the district court's dismissal of the plaintiff's CROA claim, the court held that "a person need not actually provide credit repair services to fall within the statutory definition of a credit repair organization." *Id.* at 685. "Instead," the court held, "the person need only represent that it can or will sell, provide, or perform a service for the purpose of providing advice or assistance to a consumer with regard to improving a consumer's credit record, credit history, or credit rating." *Id.* (citing 15 U.S.C. § 1679a(3)(A)). But in *Stout*, the court considered far more than a vague allegation about an agent saying credit scores could improve as a result of the services it offered. As the court explained, Freescore's website advertisements and TV commercial represented that "it provides a service for the purpose of assisting a consumer in improving the consumer's credit record, history or rating." *Id.* The court further elaborated:

> FreeScore affirmatively represents that its services can or will improve, or help to improve, a consumer's credit record, history, or rating. On its FICO information page, FreeScore clearly asks, "So how can you deal with or *improve a FICO® score?*" (emphasis added). The page continues, "Many people take years to micromanage their accounts, *attempting to repair a damaged credit score*, and many find that the best solution is preventative credit maintenance." (emphasis added). The page concludes, "Learning to manage your credit starts with getting informed about your credit. That means utilizing services like credit monitoring to find out

7

what may be changing in your credit history report; *those changes can have an immediate effect on your credit score.*" (emphasis added). Accordingly, FreeScore represents both explicitly and implicitly that its services can improve or assist in improving a consumer's credit record, history, or rating.

*Id.* at 686.

The facts of this case are closer to those of *Plattner v. Edge Solutions, Inc.*, 422 F. Supp. 2d 969 (N.D. Ill. 2006). In that case, the plaintiff enrolled in a Debt Melt Down Program, similar to Great Lakes' Debt Resolution Program. The Agreement Letter in that case, like the Retainer Agreement here, explained that the program was intended to eliminate debt over a period of time through settlement arrangements with creditors. *Id.* at 970. The Agreement Letter further explained:

> This program cannot make any assurances as to the state of your credit while on this program. It is likely that your credit score and rating will deteriorate while on the program. Upon completion of the program, Edge will work with you for 12 months in a best effort rehabilitation of your credit rating.

*Id.* at 970–71. Another letter sent to the consumer stated: "We will make every attempt to minimize any damage to your credit while you are on the program, though it is probable for some deterioration to occur. This is not unusual and we will help modify it upon completion of the program." *Id.* at 971. And in a document titled "Frequently Asked Questions," under the heading "How Does the Program Effect Credit?", the document states:

> While on the program, the credit, will in all likelihood, [sic] suffer damage that occurs when accounts are not being paid. Of course, if you are late or delinquent at present, the difference may be minimal. However, once you are debt free, the accounts will indicate a paid or settled status. Within 6 to 12 months, you will be well on your way to total recovery.

*Id.* Notwithstanding the suggestion that the program could eventually improve the plaintiff's credit score, the court concluded that the defendant was not a credit repair organization. In so ruling, the court explained:

8

> The allegations of the complaint do not suggest that Edge was a credit repair organization when it provided the Debt Melt Down Program. The Debt Melt Down Program documents make clear that participation in this program will likely result in damage to the participant's credit. They also make clear that the participant's credit is outside the scope of the program. Thus, in offering to provide the Debt Melt Down Program, Edge did not represent or even imply that this program was designed to improve the participant's credit as required for Edge to be a credit repair organization.

*Id.* at 974.

The *Plattner* court also rejected the plaintiff's argument that "the definition of a 'credit repair organization' encompasses any entity that suggests that its services or advice might ultimately result in an improved credit rating." *Id.* "[I]n light of the findings and purposes contained in § 1679, as well as the concerns expressed in the legislative history," the court reasoned, "there is no reason to believe that such a broad definition was intended by Congress." *Id.* at 975. Were the court to accept such an argument, the court concluded, "any entity that endeavored to assist consumers in paying their debts would, because debt payment assistance implicitly improves credit, fall within the scope of this statute." *Id.* To avoid this result, the court construed the statute "to reach such entities whose focus is the improvement or repair of a consumer's credit record, credit history or credit rating, expressly or implicitly, not entities whose activities are aimed at assisting consumers in developing 'creditworthy behavior' and paying their debts, which may result in improved actual credit as a collateral consequence, rather than as a program objective." *Id.*; *see also Walston v. Nationwide Credit, Inc.*, No. 18-C-7877, 2019 WL 4139002, at *4 (N.D. Ill. Aug. 30, 2019) ("Put another way, for an entity to be a credit repair organization, the purpose of the service provided by the entity, and not just the service's incidental effect, must be the improvement or repair of the consumer's credit record.").

The court finds the analysis of *Plattner* persuasive. Even assuming an agent of Great Lakes told Plaintiffs at some point over the phone that participation in Great Lakes' Debt Resolution

9

Program would improve their credit score, this allegation is not enough to overcome the clear language of the Retainer Agreement that the services being offered were not credit repair services and that Great Lakes "does not engage in credit repair or credit reporting." Dkt. No. 26-1 at 4. Such a statement, if made, suggests no more than that an incidental effect or collateral consequence of the services offered, if completed, could be improvement in their credit score. This alone does not make Great Lakes a credit repair organization within the meaning of the CROA.

It follows that Plaintiffs' claims under the CROA should be dismissed. And since no federal claims remain, the court relinquishes jurisdiction over Plaintiffs' state-law. *Wright v. Associated Ins. Co.*, 29 F.3d 1244, 1251 (7th Cir. 1994) ("The general rule is that once all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolve them on the merits."). Accordingly, Great Lakes' motion to dismiss (Dkt. No. 46) is **GRANTED**. Plaintiffs' CROA claim (Count I) is dismissed with prejudice. Plaintiffs' state-law claims (Counts II–VII) are dismissed without prejudice. The Clerk is directed to enter judgment forthwith.

**SO ORDERED** at Green Bay, Wisconsin this 11th day of December, 2025.

William C. Griesbach
United States District Judge